UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                      Case No. 3:17-cr-398

        Plaintiff

    v.                                              MEMORANDUM OPINION

Perrinne O. Cargill,

        Defendant

This matter is before me on Defendant Perrinne Cargill's motion to suppress the weapon found on his person as well as statements he made. (Doc. No. 37). The government responded (Doc. No. 39), and Cargill replied (Doc. No. 40).

On June 7, 2018 and June 11, 2018, I held suppression hearings on the motion, at which times I heard testimony from several witnesses. (Doc. Nos. 44 & 45). Following that hearing, Cargill submitted a supplemental suppression motion. (Doc. No. 52). The government filed a supplemental response (Doc. No. 57), and Cargill filed a supplemental reply (Doc. No. 58). The matter is now decisional.

For the reasons below, I deny Cargill's motion to suppress.

## DISCUSSION

Cargill moves to suppress the gun found on his person and any incriminating statements he made following the search of his person on September 1, 2017. (Doc. No. 37). Cargill does not contest that he was permissibly detained when TPD arrived at a residence to execute a search

warrant and found him on the property. (Doc. Nos. 40 at 2 & 58 at 2). But Cargill contends this "limited authority to detain does not create an authority to search those detained . . . as a matter of course." (Doc. No. 40 at 2). Cargill argues that, under the totality of the circumstances, his mere presence on the property to be searched, coupled with his compliance with officers' commands, "cannot be considered reasonable suspicion that an individual is armed and dangerous and thus subject to a *Terry* frisk for weapons." (Doc. No. 52 at 7).

The government opposes, arguing that the totality of the circumstances warranted a pat-down of Cargill. (Doc. No. 39 at 16). Cargill was walking toward a suspected drug house "where officers had observed apparent drug traffic, and where a reliable informant had observed firearms." (*Id.*). Thus, claims the government, law enforcement had a valid, reasonable, and articulable basis to believe Cargill was armed and dangerous. (*Id.* at 17).

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Supreme Court has held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (footnotes omitted).

In addition to detaining an individual, a police officer may also perform a pat-down search of an individual to search for weapons, "for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Adams v. Williams*, 407 U.S. 143, 146 (1972). "So

2

long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Id.* (internal footnote omitted). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. In making this determination, I must take into account "the totality of the circumstances—the whole picture . . . ." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

As noted above, on June 7 and 11, 2018, I held suppression hearings on Cargill's motion. (Doc. Nos. 44 & 45). I heard testimony from Toledo Police Department Vice Detectives Kenneth Heban and Lisa Long, as well as TPD SWAT Officer Adam Knaggs, Officer Justin Contreras, and Sergeant Matthew Slaman. (Doc. Nos. 44 & 45). Cargill does not dispute the facts as testified to by the TPD SWAT officers and Det. Heban. Cargill points only to inconsistencies in Det. Long's testimony. (Doc. No. 52 at 7-13).

Det. Heban testified that he was involved in the investigation of Cargill's brother, Markein. (Doc. No. 44 at 8-9). The investigation centered on activities occurring at Markein's home. (*Id.*). In August 2017, a reliable confidential source told Det. Heban that Markein was trafficking cocaine and heroin through his residence. (Docs. 44 at 9 & 39-1 at 7). The source also said Markein possessed guns. (Doc. No. 39-1 at 7). Det. Heban further investigated and determined that Markein was an associate of the Outcast Motorcycle Club, an organization known to be involved in criminal activity. (Doc. Nos. 39-1 at 7 & 44 at 15).

Early in August 2017, the source informed Det. Heban that Markein had moved to a new residence – a duplex located at 1315 Shenandoah. (Doc. Nos. 39-1 at 8 & 44 at 8). The source reported "constant foot and vehicle traffic" at all hours and reported observing Markein complete multiple cocaine and heroin transactions in both units of the duplex. (Doc. No. 39-1 at 8). Det.

3

Heban found numerous neighbor complaints alleging the same conduct. (*Id.*; Doc. No. 44 at 11). Det. Heban identified this activity as consistent with drug trafficking. (Doc. No. 39-1 at 8).

Det. Heban and other detectives then undertook surveillance of Markein's home, personally observing high-volume foot and vehicle traffic involving individuals who only stayed at the residence briefly. (Docs. No. 39-1 at 8-9 & 44 at 9). Det. Heban observed Markein conducting hand-to-hand transactions on his front porch and in his front yard. (Doc. Nos. 39-1 at 8 & 44 at 9-10). Det. Heban identified these observations as indicating drug trafficking. (Doc. Nos. 39-1 at 8 & 44 at 10).

Det. Heban also researched Markein's criminal history, finding he had multiple felony drug-trafficking convictions and a conviction for being a felon in possession of a firearm. (Doc. No. 39-1 at 8).

Late in August, Det. Heban again spoke with his confidential source, who stated Markein had large quantities of cocaine and heroin on his person and was preparing for a drug transaction. (*Id.*). Specifically, the source informed Det. Heban that Markein would acquire cocaine and heroin on the last day of each month and then begin selling it on the first day of the next month. (*Id.* at 9). The source also reported that Markein and an unidentified African-American male were processing powder cocaine into crack cocaine at Markein's residence. (*Id.*). The source again reported there were multiple firearms in Markein's residence, including a shotgun, and he reported the presence of a pitbull. (*Id.* at 8-9).

Based on this information, particularly the firearms and Markein's criminal history, a judge issued a no-knock warrant for both units of the duplex on Shenandoah. (Doc. Nos. 44 at 17 & 59 at 5-6). Det. Heban testified that a no-knock warrant waives the requirement that law enforcement must knock and announce themselves; the requirement is waived when there is a potential for violence occurring during execution of the warrant. (Doc. No. 44 at 17).

Prior to execution of the search warrant, Det. Heban completed a threat assessment, which he then provided to the SWAT team. (*Id.* at 12-13; Doc. No. 59 at 1-3). After inputting all the relevant data, the threat assessment form calculated the total score for this warrant service at fifty-nine. (Doc. No. 59 at 3). This made the warrant a high-risk warrant. (*Id.*; Doc. No. 44 at 19). Det. Heban testified that this is one of the highest threat assessment scores he has encountered in his experience completing these forms. (*Id.*).

The warrant was executed on September 1, 2017. (Doc. No. 44 at 11). TPD officers drove a convoy of law enforcement vehicles, led by the SWAT vehicle, to the Shenandoah residence that afternoon (Doc. No. 44 at 23). Upon their approach, Officer Knaggs, while still in the SWAT vehicle, observed an individual walking through the yard of the Shenandoah residence, apparently heading toward the door of the residence. (Doc. No. 44 at 78-79). And Officer Contreras, who was driving the SWAT vehicle, observed a male walking across the target property, heading for the door of the residence. (Doc. No. 45 at 14). That male was Perrinne Cargill. (Doc. No. 44 at 111).

As SWAT officers exited their vehicle and approached the front door of the residence, they encountered Cargill, and Officer Knaggs ordered him to the ground. (*Id.* at 82-82). Cargill complied. (*Id.* at 111). Each officer in SWAT's lineup "checked off" on Cargill, verifying he was compliant, and then continued on toward the house to secure the premises for a search. (*Id.* at 111-12). Two SWAT officers testified that their arrival at the premises, approach to the house, and encounter with Cargill took anywhere from less than five to thirty seconds. (Doc. No. 44 at 84 & 112-13).

And as Cargill notes in his supplemental brief, every officer who testified stated that Cargill immediately complied with demands to get on the ground and that he did not exhibit any suspicious or threatening behavior during the execution of the search warrant. (Doc. No. 52 at 5-6).

Det. Long came behind the line of SWAT officers and took custody of Cargill. (Doc. No. 45 at 38). She handcuffed him and patted him down. (*Id.* at 39). There is a discrepancy, based on

5

Det. Long's testimony, as to the timing of her interaction with him. Det. Long first testified that as she was handcuffing Cargill, she was asking him if he had any weapons on him. (*Id.* at 40). When he answered that he had a gun in his pocket, she retrieved the gun from his pocket. (*Id.*). On cross-examination, she testified that as she was patting him down, she asked if he had any weapons on him. (*Id.* at 49). When defense counsel asked her to clarify the sequence of events, she testified that as she was handcuffing Cargill, she was asking him if he has any weapons on him, and while she was still talking, she started to pat him down. (*Id.* at 50-51). Her testimony thus appears to be that as she was asking him about contraband on his person, she was first handcuffing him and then patting him down. Det. Long then reported her finding the gun to Det. Heban. (*Id.* at 52).

Cargill argues that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). And this is true. But the circumstances in *Ybarra* differ from those present in this case. In *Ybarra*, an informant gave information to police indicating he had seen packets of heroin behind the bar of the Aurora Tap Tavern and on the person of a particular bartender. *Id.* at 87-88. The informant also reported that the bartender was selling heroin. *Id.* at 88. Police obtained a search warrant for the tavern based on this information. *Id.* When police executed the search warrant, Ybarra happened to be in the tavern. *Id.* Officers patted down everyone in the bar, and they found heroin on Ybarra. *Id.* at 88-89.

The Court held Ybarra's rights were violated by the pat-down. *Id.* at 96. The Court stated there "no reason to suppose that, when the search warrant was issued . . ., the authorities had probable cause to believe that any person found on the premises of the Aurora Tavern, aside from [the bartender], would be violating the law." *Id.* at 90. The application for the warrant made no mention of people frequenting the bar to purchase drugs, and the informant did not report having seen a bar patron purchase drugs from the bartender. *Id.*

This is distinguishable from the instant case, where officers had amassed information that the Shenandoah residence was frequented by individuals appearing to purchase drugs and that an unidentified male had been seen at the residence helping to produce drugs. TPD also received reports of firearms at the house.

I find this case is analogous to *Vite-Espinoza*, where the Sixth Circuit upheld the detention and pat-downs of individuals found in the backyard of a house that was searched pursuant to a search warrant. *United States v. Vite-Espinoza*, 342 F.3d 462, 465 (6th Cir. 2003). Police suspected the house was used to produce and sell counterfeit immigration documents and social security cards, and to sell marijuana. *Id.* The court held that "rational inferences warranted reasonable suspicions that those encountered on the premises would either be counterfeiters themselves or their illegal alien customers, because legal residents have of course little need for counterfeit documents, or that they would be armed and dangerous, because drug traffickers tend to be so." *Id.* at 467.

The case before me is quite similar. Based on the information gathered by TPD from a reliable confidential source, their own surveillance, and their research, officers had reason to believe the Shenandoah residence was used for the trafficking of cocaine and heroin. They also had reason to believe crack cocaine was being produced at the residence with the help of another African-American male. Their intelligence-gathering also revealed that high volumes of people came to the house at all hours of the day and night. This provided for the rational inference that anyone the officers encountered on the property when they arrived to execute the search warrant was likely to be involved in drug trafficking. *See Vite-Espinoza*, 342 F.3d at 467. And the Sixth Circuit has held that "where an officer suspects drug activity, he can reasonably infer that the suspect is armed and dangerous." *United States v. Akinyemi*, 101 F. App'x 109, at *2 (2004) (citing *Vite-Espinoza*, 342 F.3d at 467).

Further, based on the information TPD had gathered about Markein, including his criminal history, his association with the Outcast Motorcycle Gang, the alleged criminal activity taking place

7

at his residence, and the reported presence of firearms in the house, a judge issued no-knock warrants, recognizing the dangerousness of executing the warrants under these circumstances. And the threat assessment Det. Heban completed evaluated these warrants as high-risk.

This is the information and understanding officers had when they went to execute the search warrants on the Shenandoah residence and encountered Cargill walking through the yard of the residence, apparently heading for the door of the house. Cargill's trajectory across the lawn of the house confirms the witnesses' assumption. It was thus reasonable for officers to infer he was likely involved in drug trafficking and therefore likely to be armed and dangerous. All of these circumstances surrounding the warrants and their execution, taken together, create reasonable, articulable suspicion.

It is true that once officers were on site, Cargill complied with all of their directives and that he did not behave in a suspicious or threatening manner. But this is not enough to negate all the other circumstances surrounding the warrants and their execution. As such, I find Det. Long did not violate Cargill's rights when she patted him down.

Cargill also made a passing argument in his supplemental brief that his statement, in response to Det. Long's question, acknowledging he had a gun on his person should be suppressed as an unwarned custodial statement. (Doc. No. 52 at 8). The government argues the statement should not be suppressed, as Det. Long's conduct falls within the public safety exception to *Miranda*. (Doc. No. 57 at 25). Cargill appears to abandon this argument in his supplemental reply. He offers no rebuttal to the government's argument that the public safety exception applies, and he states that he is asking me to "suppress the weapon and all statements because the frisk was performed in violation of [his] Fourth Amendment rights and his alleged statement stemmed from questioning that was based on the alleged finding of a weapon." (Doc. No. 58 at 2). But in an abundance of caution, I will address this argument.

The Fifth Amendment protects a defendant from being compelled to be a witness against himself. The Supreme Court thus held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Thus, the Court required the implementation of procedural safeguards – *Miranda* warnings – to protect that privilege. *Id.*

Here, the government agrees that Cargill was effectively in custody when he admitted to having a gun on his person, as he was either already handcuffed or being handcuffed when he made the statement. (Doc. No. 57 at 24-25). But the government claims the public safety exception applies. (*Id.* at 25).

This exception provides that when "officers ask questions necessary to secure their own safety or the safety of the public as opposed to questions designed solely to elicit testimonial evidence from a suspect, they do not need to provide the warnings required by *Miranda*." *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007) (quoting *New York v. Quarles*, 467 U.S. 649, 659 (1984)) (internal quotation marks omitted). The exception applies when "officers have a reasonable belief based on articulable facts that they are in danger." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). The reasonable test is objective, not subjective. *Id.*

Having fully described and analyzed above the circumstances surrounding the obtaining of the search warrants and their execution, I now refer to and incorporate that analysis here and find that it was reasonable for Det. Long to believe she and the other officers were in danger at the time she questioned Cargill. As such, it was permissible for her to ask Cargill if he had weapons on his person in an effort to secure her own safety and the safety of others. I therefore find the public safety exception applies.

## CONCLUSION

Accordingly, I deny Cargill's motion to suppress. (Doc. No. 37). A telephone pretrial conference is scheduled for September 19, 2018 at 10:00 a.m. My chambers will initiate the phone call.

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge